UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 21-61176-CIV-SINGHAL

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

PROPERTY INCOME INVESTORS, LLC,
EQUINOX HOLDINGS, INC.,
PROPERTY INCOME INVESTORS 26, LLC,
PROPERTY INCOME INVESTORS 304, LLC,
PROPERTY INCOME INVESTORS 201, LLC,
PROPERTY INCOME INVESTORS 3504, LLC,
PROPERTY INCOME INVESTORS 1361, LLC,
PROPERTY INCOME INVESTORS 4020, LLC,
PROPERTY INCOME INVESTORS 9007, LLC,
PROPERTY INCOME INVESTORS 417, LLC,
PROPERTY INCOME INVESTORS 4450, LLC,
PROPERTY INCOME INVESTORS 3050, LLC,
LARRY B. BRODMAN and ANTHONY
NICOLOSI (f/k/a ANTHONY PELUSO),

      Defendants.

_____/

## RECEIVER'S FIFTH INTERIM QUARTERLY REPORT

(Period Covered: April 1, 2022 – June 30, 2022)

Miranda L. Soto, Esq., solely in her capacity as Receiver (the "Receiver") for Defendants,

Property Income Investors, LLC; Equinox Holdings, Inc.; Property Income Investors 26, LLC;

Property Income Investors 304, LLC; Property Income Investors 201, LLC; Property Income

Investors 3504, LLC; Property Income Investors 1361, LLC; Property Income Investors 4020,

LLC; Property Income Investors 9007, LLC; Property Income Investors 417, LLC; Property

Income Investors 4450, LLC; and Property Income Investors 3050, LLC (collectively, the

"Receivership Entities"), and pursuant to the Order Granting Plaintiff Securities and Exchange

Commission's (the "Commission") Motion for Appointing Receiver, dated June 15, 2021 (Doc.

10), respectfully files her Fifth Interim Report.

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

    A.      Overview of Significant Activities During This Reporting Period ....................... 1

II.     BACKGROUND ...................................................................................................... 3

    A.      Procedure and Chronology ........................................................................... 3

    B.      The Receiver's Role and Responsibilities ..................................................... 4

III.    THE RECEIVER'S PROGRESS AND PRELIMINARY FINDINGS DURING THE
    RELEVANT PERIOD ............................................................................................. 5

    A.      Actions Taken By the Receiver During Reporting Period.............................. 5

        i.      Securing Receivership Estate Personal Property ......................... 5

            a.      Bank Accounts and Cash Proceeds................................... 5

            b.      Other Personal Property.................................................... 6

        ii.     Securing and Maintaining Receivership Real Property ................ 6

            a.      Managing and Maintaining Real Property Assets ........... 6

            b.      Mortgage and Tax Obligations ....................................... 9

            c.      Insurance Status and Renewals..................................... 10

        iii.    Marketing And Selling Receivership Real Estate..................... 10

            a.      Listing Properties For Sale............................................ 10

            b.      Court-Approved Sales And Closing Status................... 11

        iv.     Analyzed Various Documentation and Worked With Retained
            Forensic Accountant ..................................................................... 13

        v.      Filed Motion Seeking Approval Of Claims Process **Error! Bookmark not
            defined.**

        vi.     Continued Outreach with Investors And Interested Parties..................... 14

    B.      The Receiver's Preliminary Findings From Her Ongoing Investigation............... 16

        i.      The Equinox and Property Income Investors Offerings ........................ 16

            a.      The Equinox Offering .................................................. 16

            b.      The Property Income Investors Offerings...................... 18

        ii.     At Least Some Receivership Entities Did Not Generate Sufficient
            Cash Flow To Cover Distributions To Investors And Depended On
            "Loans" From Other Receivership Entities To Meet Any Shortfalls ........ 20

        iii.    Nearly $2 Million Was Paid To Company Insiders Including
            Brodman.................................................................................. 23

        iv.     Sales Agents Were Used To Solicit Investors Paid Transaction-
            Based Compensation...................................................................... 25

i

v.    Investor Funds Appear To Have Been Routinely Commingled And Used For Unauthorized Purposes For Several Years ..................................28

vi.   Over $50,000 Of Investor Funds Were Lost When Brodman Forfeited A Real Estate Purchase Deposit ..................................32

IV.   THE NEXT QUARTER ..................................................................................... 33

A.   Continuing Investigation ........................................................................33

C.   Administering Claims Process, Determining Submitted Claims, And Seeking Court Approval Of Claim Determinations And Distribution Plan ..........34

D.   Third Party Claims ................................................................................35

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

## I.      INTRODUCTION

Miranda L. Soto, Esq., solely in her capacity as Receiver (the "Receiver") for Receivership Entities Property Income Investors, LLC ("PII"); Equinox Holdings, Inc. ("Equinox"); Property Income Investors 26, LLC; Property Income Investors 304, LLC; Property Income Investors 201, LLC; Property Income Investors 3504, LLC; Property Income Investors 1361, LLC; Property Income Investors 4020, LLC; Property Income Investors 9007, LLC; Property Income Investors 417, LLC; Property Income Investors 4450, LLC; and Property Income Investors 3050, LLC, hereby files this Fifth Interim Report to inform the Court, investors, and interested parties of the significant activities undertaken from April 1, 2022 to June 30, 2022, as well as proposed courses of action moving forward.  In addition to providing notice of the receivership to all known investors shortly after her appointment, the Receiver has established an informational website at www.propertyiireceivership.com, which is regularly updated with important court filings (including all Interim Reports), announcements, and other news that might be of interest to affected individuals and third-party entities.

### A.      Overview of Significant Activities During This Reporting Period

During the time period covered by this Interim Report (April 1, 2022 through June 30, 2022), the Receiver and her counsel have engaged in significant activities including but not limited to:

- Worked with Local Real Estate Co. to market, list, and close on the final two remaining Properties (3050 Coral Springs Drive, Coral Springs, FL 33605) and (201 East 30th Street Riviera Beach, FL, 33404), which resulted in contracts that closed on April 1, 2022 and May 13, 2022, respectively. During the reporting period, these two Properties brought in net proceeds of **$2,128,307.11.** Prior to sale of these Properties:

  - Continued to work with Keyes Property Management, LLC to maintain and secure the above-referenced Properties pending sale, including the collection of rent from tenants and attending to maintenance and upkeep for the Properties until the closings of all Properties; and

1

  o Favorably resolved a fine on the 3050 Property, previously imposed by a local government due to violations incurred prior to the Receivership, which resulted in a discount of approximately 90% of the assessed fine;

- Performed final tasks finalizing the closure of various administrative accounts for the Properties that closed during prior two reporting periods, which included the following Properties: (i) 1361 SE 4th Street, Deerfield Beach, 33441, (ii) 530 NE 34th Street, Pompano Beach, FL 33064, (iii) 4020 Riverside Drive, Coral Springs, FL 33065, (iv) 4450 Coral Springs Drive, Coral Springs, Florida 33065. These properties had previously brought in net sales proceeds of **$2,002,084.70**;

- Continued investigation into operation of Receivership Entities, including analysis of business operations, investor files and offering documents, and financial activity;

- Worked with her forensic accountants to identify, gather, and analyze investor files and relevant financial documentation in order to understand operation of Receivership Entities, formulating a framework for the Court-approved claims process;

- Worked with her forensic accountants to review, analyze, and determine investment information and activity for each potential investor claimant, and assembled central database to assist with anticipated forthcoming claims process;

- Further worked with her forensic accountants to authorize and facilitate the preparation of tax returns for the Receiver entities, including the issuance of K1's to investors. Receiver's forensic accounts anticipate that the returns will be ready for Receiver review in late August;

- Obtained a Court Order (Doc 77) ('Claims Process Order") approving Receiver's Motion to Establish and Approve (i) Proof of Claim Form and Claim Bar Date; (ii) Procedure to Administer, Review, and Determine Claims; and (iii) Notice Procedures and Incorporated Memorandum of Law (the "Claims Motion"). The Claims Motion and Order are available on the Receiver's website at www.propertyiireceivership.com;

- On June 30, 2022, sent 158 investor claims packets, explaining the claims process, providing Receiver's preliminary calculation of each investor's claim (for investors with documentation in the Receivership's possession), and requesting investors to complete a questionnaire (Claims Form) and provide documentation to establish their respective claims. A sample of the claims packet is available on the Receiver's website at www.piireceivership.com along with contact information in the event investors have questions regarding the process. The preparation of the claims estimates required having Receiver's professionals sort through extensive and often confusing or incomplete company documents to reconcile invested sums with any dividends or other payouts recorded as having been sent to investors. Receiver's professionals also had to engage in open source research to verify correct mailing addresses for about a half dozen investors whose addresses were not accepted by the UPS website for delivery labels, which required sending their packages for delivery by United States Post. As required in the Claims Process Order, the Receiver also caused notices of the claims process to be published in

2

two newspapers – the Sun Sentinel of Fort Lauderdale, Florida and the Wall Street Journal. The Receiver also published announcements on the Receiver's website;

- Continued review of potential claims to recover investor assets wrongfully misappropriated and/or fraudulently transferred;

- Successfully opposed efforts by certain investors (investors Richard Bentley, Joseph Alexander, and P&E Properties, LP) to leapfrog over the Court-mandated claims process in a parallel state court action, including filing a Response (Doc. 87) to Motion for Clarification (Doc. 84) and obtained an Order denying said Motion (Doc. 96) from this Court;

- Continued work to ascertain locations of the properties, books, records, bank accounts and other assets of the Receivership Entities;

- Responded to phone calls and written communications from investors, tenants, prospective buyers and other interested parties and/or their representatives and continued to update Receiver's website with case information and document filings;

- Communicated with investors regarding the Claims Process; and

- Prepared and filed the Receiver's Fourth Interim Report on May 22, 2022 (Doc. 81) which provided a comprehensive summary, analysis, and supporting documentation of the Receiver's preliminary observations, continuing investigation, and contemplated next steps;

The above referenced activities are discussed in more detail in the pertinent sections of this Interim Report.

## II.   BACKGROUND

### A.   <u>Procedure and Chronology</u>

On June 7, 2021, the Commission filed a complaint (Doc. 1) (the "Complaint") in the United States District Court for the Southern District of Florida (the "Court") against Defendants Larry Brodman, Anthony Nicolosi f/k/a Anthony Peluso, and the Receivership Entities.  The Commission alleged that Defendant Brodman and the Receivership Entities raised at least $9 million from over 150 investors who were told that their funds would be used almost entirely to purchase "turnkey, multifamily properties" in South Florida which would then be renovated, rented to tenants, and eventually sold. *Id.* ¶ 3.  Investors were also told that they would be entitled

3

to receive a portion of the rental income and any sale proceeds generated from the Properties they were investing in.

Although a portion of investor funds were used to purchase various properties in the South Florida area, the Commission alleged that Defendant Brodman and the PII entities misappropriated and diverted over $2 million in investor funds, extensively commingled investor funds, and in some instances used investor funds to make purported "profit" payments and distributions to other investors.  (Doc. 10 ¶¶ 4, 70-71.)  The Commission also alleged that, despite statements in the offering materials that commissions would only be paid to licensed brokers, PII and Brodman used at least $1.2 million in investor funds to pay undisclosed sales commissions to unlicensed sales agents including Defendant Nicolosi.  *Id.* ¶¶ 68-69.

On June 15, 2021, the Court granted the Commission's Motion for Appointment of Receiver and entered an Order appointing Miranda L. Soto as the Receiver over the Receivership Entities ("Order Appointing Receiver") (Doc. 10).    The Commission and the individual Defendants are scheduled to mediate this case on April 5, 2022.  (Doc. 47.)

**B.**    **The Receiver's Role and Responsibilities**

As an independent agent of the Court, the Receiver's powers and responsibilities are set forth in the Order Appointing Receiver which provides, in relevant part, that the Receiver:

- "[S]hall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Entities under applicable state and federal law…" and "shall assume and control the operation of the Receivership Entities and shall pursue and preserve all of their claims." Doc. 10 ¶¶ 4-5;

- Shall "take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities…" and "manage, control, operate and maintain the Receivership Estates and hold in Receiver's possession, custody and control all Receivership Property, pending further Order of the Court." *Id.* ¶ 7(b)-(c);

4

- Is "authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings…as the Receiver deems necessary and appropriate…" *Id.* ¶ 37; and

- Is directed to "develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property…and to "file and serve a full report and accounting of each Receivership Estate" for each calendar quarter. *Id.* ¶¶ 46, 48.

## III.   THE RECEIVER'S PROGRESS AND PRELIMINARY FINDINGS DURING THE RELEVANT PERIOD

The Receiver's issuance of interim quarterly reports is intended to, among other things, present a detailed summary of actions taken by the Receiver during the reporting period as well as to share the status of her various preliminary findings and ongoing investigation. Unless specifically indicated herein, any previously-expressed preliminary findings are incorporated herein and remain consistent with the Receiver's ongoing investigation. The Receiver reserves the right to revise, amend, and/or supplement these conclusions as the investigation progresses. The Receiver presents the following non-exclusive conclusions that she continues to supplement based on her ongoing investigation and document review and with the assistance of her Retained Professionals.

### A.   Actions Taken By the Receiver During Reporting Period

#### i.   Securing Receivership Estate Personal Property

##### a.   Bank Accounts and Cash Proceeds

As reported in detail in previous Reports, the Receiver proceeded to open fiduciary bank accounts at ServisFirst Bank (the "ServisFirst Accounts") following her appointment and coordinated the freeze and closure of the Receivership Entities' existing bank accounts with JP Morgan Chase Bank, N.A. ("Chase Bank"). The Receiver also took action to secure approximately $1.125 million consisting of proceeds from the recent sale of two properties formerly owned by

5

the Receivership Entities that were being held in escrow by a Boca Raton law firm.  After securing those funds, the Receiver then transferred those funds to the ServisFirst Accounts.  During the reporting period, the primary activity that occurred was (i) the deposit of net sale proceeds from the closing of the sale of the two Properties referenced above, including associated post-closing refunds and holdbacks; (ii) the deposit of monthly rental income received from the Receiver's property management firm; and (iii) the payment of Court-approved fees and costs to the Receiver and her Retained Professionals.

As of the date of the filing of this Report, the total balance of the ServisFirst Accounts was **$4,803,322.77.**[1]

> b.    Other Personal Property

After taking possession of various computers and paper files kept in a storage unit previously used by the Receivership Entities, the Receiver has disposed of the remaining contents and vacated the storage unit to avoid continuing monthly costs of over $300.  The Receiver continues to maintain and store the various company documents and computer hardware that were previously removed from the storage unit. During the Reporting Period, the Receiver donated four flat-screen televisions and received the receipts to claim such donation as deductions on entity tax returns, if applicable.

> **ii.    Securing and Maintaining Receivership Real Property**

> a.    Managing and Maintaining Real Property Assets

At the time of the Receiver's appointment, the Receivership Entities owned seven multifamily residential properties in the South Florida area.  Further details on each of these

---

[11] The Receiver is in the process of wiring the remaining funds from her firm trust account to service in the amount of $360,013.90. Once wired, the total amount in the Servis accounts will be **$5,163,336.67.**

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

properties, including purchase and property information, is set forth in Section V.F of the First Interim Report (Doc. 20) and incorporated herein. The Receiver's immediate priority at that time was to secure the Properties, ensure that tenants were aware of her appointment and their continuing obligation to pay monthly rent, and investigate the condition of the Properties and whether there were any existing encumbrances. The Receiver subsequently interviewed several property management companies and ultimately received Court approval to retain Keyes Property Management ("Keyes") on July 1, 2021 (Doc. 15). Keyes immediately began outreach to current tenants, inspection of the Properties, and implemented its proposed property management services. The Receiver also provided all of the tenants with correspondence notifying them of Keyes' retention and has been pleased with Keyes' diligence and service thus far.

As discussed in previous Reports, the Properties visually appeared to be in good condition but it has become apparent that the Receivership Entities were behind in attending to maintenance issues in the months preceding the Receiver's appointment. Since the Receiver's appointment, tenants have submitted nearly 100 work orders through a tenant communication portal established by Keyes, ranging from minor maintenance issues to more serious issues, including the replacement of appliances and an air conditioning system as well as a roof leak repair. The Receiver and Keyes have also learned of a number of existing code compliance issues which have required (sometimes significant) attention and the expenditure of funds, including payment of fines, to remedy any deficiencies. Until all properties were sold, the Receiver was in constant contact with Keyes to ensure any issues are promptly and efficiently addressed.

These maintenance requests have reduced the net rental income generated by the Properties which is ultimately deposited into the Receivership Estate. The following chart depicts the approximate repair costs and utility expenses (which does not include Keyes' 6.5% management

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

fee) for all the Properties during the past several reporting periods, as well as the total amount of rental income collected during those periods:

| Time Period | Approximate Repair/Utility Expenses | Total Rental Income |
|---|---|---|
| 7/1/21 – 9/30/21 | $20,000.00 | $73,000.00 |
| 10/1/21 – 12/31/21 | $30,000.00 | $80,000.00 |
| 1/1/22 – 3/31/22 | $24,721.00 | $45,330.00 |
| 4/1/22 – 6/30/22 | $1,401.62 | $3,803.00 |

Prior to closing on all Properties, the Receiver worked with Keyes to understand and investigate each tenant's relationship, including previous rent history, lease status, and other obligations.  Based on Keyes' analysis, it appears that (i) nearly all of the leases had expired and were continuing on a month-to-month basis, and (ii) nearly all of the tenants were paying monthly rent that was below market – and in many instances significantly below market.  Although the Receiver considered attempting to raise the rents to bring them closer to the market rates for the respective locales, the Receiver consulted with her professionals and ultimately determined to keep the rents as-is given a number of factors, such as (i) tenants could refuse to agree to the new increases but refuse to vacate the units, thus resulting in lost rent and possibly necessitating eviction proceedings; (ii) tenants could refuse to agree to the new increases and vacate the units, thus resulting in vacancies and lost rent while a new tenant was located (which would have also resulted in payment of a commission to Keyes amounting to the first month's rent); and (iii) because the Properties were also listed for sale, tenants on month-to-month leases would be seen as more desirable by potential buyers.[2]

_____

[2] Certain tenants were either receiving housing assistance or had begun the process of seeking housing assistance.  As part of the requirements for receiving housing assistance, the tenant was required to be on a new one-year lease.  Where necessary, in order to continue receiving that

8

The Receiver's investigation also showed that, prior to her appointment, tenant security deposits do not appear to have been properly handled and/or segregated.  Specifically, records reviewed by the Receiver showed that the Receivership Entities had collected approximately $23,000 in security deposits on the Properties; yet, the total balance of the various Receivership accounts at Chase Bank was approximately $14,000 at the time of the Receiver's appointment, and no account was titled as a segregated security deposit account. Consequently, credits for security deposits have been given to the ultimate purchasers of each property.  The Real Estate Professionals at Keyes also provided payment of the rent to the purchasers based on the closing dates of each property.

> b.   <u>Mortgage and Tax Obligations</u>

As previously detailed in the First Interim Report, the Receiver discovered that two of the Properties had an outstanding mortgage at the time of her appointment.  Both of the mortgaged properties have since been sold and closed, and the outstanding respective mortgage balances were paid off at closing.

The Receiver's investigation also showed that a number of the Receivership Entities failed to pay property taxes owing in 2020.[3]  As a result, the collecting county sold approximately $70,000 in "tax certificates" for the relevant Properties in order to recoup the delinquent amounts.[4]

---

housing assistance income, the Receiver agreed to enter into a new one-year lease with that particular tenant.  Where possible, the Receiver also requested an increase in the monthly rent.

[3] As detailed in Section III.A.ii.b in the Third Interim Report, the Receiver took steps to pay the currently owing 2021 real property taxes on November 30, 2021, which resulted in savings of approximately $1,000 over the amount due had the Receiver waited until the March 31, 2022 deadline.

[4] A "tax certificate" is an interest-bearing first lien representing unpaid delinquent real estate property taxes which are sold through a public auction to the buyer offering the lowest rate of interest.  If the tax certificate remains outstanding and unpaid for two years, the owner of the certificate may apply for a tax deed and ultimately seek to foreclose and even acquire the property.

9

Given that the tax certificates had been recently issued at the time of the Receiver's appointment and, thus, were not immediately at risk of being converted to a tax deed, the Receiver did not take any action on repaying the tax certificates, anticipating that each certificate would be redeemed at the time the corresponding property was sold and closed.  The Receiver had previously indicated that she would reevaluate this plan if any of the Properties remain unsold by June 1, 2022, but unnecessary, as the Receiver soldall Properties before that milestone date.

c.    <u>Insurance Status and Renewals</u>

One of the Receiver's immediate priorities following her appointment was to verify that each of the Properties was covered by property and casualty insurance.  The Receiver was able to locate the insurance agency that had written the current policies and verify that all Properties were covered by property and casualty insurance.  However, the Receiver's investigation showed that none of the Properties carried windstorm insurance coverage despite their location in South Florida.  As the insurance policies in place for the Properties came up for renewal, the Receiver solicited quotes to both renew the casualty insurance and also to implement windstorm coverage. The Receiver elected to finance the insurance premiums given the concurrent listing of the Properties, which allowed the Receiver to expend fewer funds in initially securing the policies and also provided greater flexibility to cancel the policies at the time of sale.  As the Properties have been sold and closed, the Receiver has been cancelling the respective policies and requesting refunds of any unearned premiums.

### iii.    Marketing and Selling Receivership Real Estate

a.    <u>Listing Properties for Sale</u>

As detailed in previous Reports, the Receiver selected Daniel Otten with Local Real Estate Co. to serve as her listing agent after interviewing several interested agents.   Following his

10

engagement, Mr. Otten and his team worked diligently to visit and inspect the Properties, utilize a professional photographer to prepare offering materials, and develop a comprehensive pricing and listing strategy.  Following extensive discussions and collaboration with Mr. Otten and his team, the Receiver authorized the listing of the Properties, which went live in September 2021.  The Properties were listed on several listing sites as well as on the Receiver's Assets for Sale page of her website.[5]

The Receiver's sale of real estate is subject to compliance with relevant federal statutes as well as approval by the Court.  Specifically, the Receiver must abide by 28 U.S.C. § 2001(b), which not only requires that any sale of real estate must be approved by the Court and supported by three independent appraisals, but also requires that the Receiver publish notice of the sale in a local newspaper for at least ten days before any sale may be confirmed and allows an interested third-party to submit a "*bona fide* offer" which guarantees at least a 10% increase over the proposed sale price during the ten-day period following publication of the notice.  Unless otherwise warranted, the Receiver abides by these requirements and has sought Court approval for all sales of the Properties pursuant to 28 U.S.C. § 2001.  The Receiver has posted copies of all sale motions on her website.

b.    <u>Court-Approved Sales and Closing Status</u>

The listings generated significant demand from prospective buyers, with all Properties receiving multiple (and sometimes numerous) offers.  With the assistance of Mr. Otten and his team, the Receiver evaluated these offers and, as appropriate, accepted or made a counter-offer. Once the Receiver entered into a contract with a potential buyer, the Receiver sought and obtained Court approval.   Below is a summary of all the closed sales:

---

[5] *See* www.propertyiireceivership.com/assets-for-sale

| Property[6] | Sales Price | Purchase Price | % Increase |
|---|---|---|---|
| 3775 116th Terrace | $790,000.00 | $550,000.00 | 43.6% |
| 1361 SE 4th Street | $835,000.00 | $635,000.00 | 31.5% |
| 530 NE 34th Street | $410,500.00 | $345,000.00 | 19.0% |
| 4450 Coral Springs Drive | $550,000.00 | $405,000.00 | 35.8% |
| 4020 Riverside Drive | $775,000.00 | $468,000.00 | 65.6% |
| 3050 Coral Springs Drive | $1,775,000.00 | $1,250,000.00 | 42% |
| 201 E. 30th Street | $495,000.00 | $265,000.00 | 86.7% |

Pursuant to the underlying Purchase and Sale Agreement for each of the Properties, the closings were to occur within 30 days of the Court's Order approving the sale. Following execution of each Purchase and Sale Agreement, the Receiver prepared and filed a motion seeking Court approval of the sale of the respective property as well as the proposed procedures to comply with 28 U.S.C. § 2001 and close the sale. As of the end of the Reporting Period, all the Properties had been approved for sale by the Court and closed. (*See* Docs. 32-33, 40-42, 69, and 78.)

Following the Court's approval of a property sale, the Receiver published notice of the proposed sale in the county where the respective Property was located.[7] The notice advised any prospective buyers of their ability to submit a *bona fide* offer pursuant to 28 U.S.C. § 2001 within ten (10) days of the publication of the notice. The Receiver did not receive any timely submitted *bona fide* offers and proceeded to work with the prospective buyers to prepare for closing.

---

[6] For ease of reference, this Report will reference the specific properties using an abbreviation of the street number and the word "Property." For example, reference to the property located at 3775 NW 116th Terrace, Coral Springs, FL 33065 will be made as the "3775 Property."

[7] The majority of the notices were published in the *Sun-Sentinel* located in Broward County. However, for the sole property which is located in Palm Beach county, the Receiver has asked the Court for approval to publish the proposed sale notice in the *Palm Beach Post* which is the local newspaper in that county. Doc. 68.

12

iv.  **Analyzed Various Documentation and Worked With Retained Forensic Accountant**

The Receiver continues to review company records and third-party productions in order to (i) understand the Receivership Entities' business operations and relationships prior to her appointment; (ii) identify any potential assets that belong to the Receivership Entities; and (iii) identify and analyze investor transactions.  Given the Commission's allegations of "extensive commingling of investor funds," the Court approved the Receiver's retention of Kaufman & Company, P.A. ("Kaufman") to provide forensic accounting and tax services to the Receiver.  The Receiver has asked Kaufman to prioritize the analysis of the bank accounts and assembly of an investor roster showing the amounts raised from and distributed to each investor.  Kaufman has provided the Receiver with its preliminary findings on the "extensive commingling" alleged to have taken place within the Receivership Entities' bank accounts. At the request of the Receiver, Kaufman also begin the process of completing Tax Returns for the Receivership Entities, which will allow for K1s to be processed by the claimants. Kaufman anticipates that returns will be ready for review by the Receiver in late August, 2022.

The Receiver also continues to investigate any potential claims the Receivership Estate may have against any third-parties based on funds transferred to those third parties or services provided by those third parties.

v.  **Initiated Claims Process as Detailed in December 31, 2021 Filing**

As detailed in previous Reports, the Receiver's goal since her appointment was to be in a position to file a motion with the Court by December 31, 2021, seeking approval of the framework and procedures for a claims process that can return assets to investors and other interested parties with approved claims.  Based on her team's efforts and progress, the Receiver was able to meet this goal and filed her *Motion to Establish and Approve (i) Proof of Claim Form and Claim Bar*

13

*Date; (ii) Procedure to Administer, Review, and Determine Claims; and (iii) Notice Procedures and Incorporated Memorandum of Law* (the "Claims Motion") on December 31, 2021.  The Claims Motion is available on the Receiver's website at www.propertyiireceivership.com.

In the Claims Motion, the Receiver proposed (i) the establishment of a deadline for the submission of claims, (ii) approved forms for claim submissions, (iii) claims notification and publication procedures, and (iv)the framework by which the Receiver will calculate and administer the claims process.  (Doc. 48.)  Although the Court issued an Order on January 10, 2022, granting the Claims Motion, the Court subsequently vacated that Order after two responses to the Claims Motion were filed on January 14, 2022.  The Receiver subsequently filed a Reply in support of the Claims Motion on January 21, 2022. Doc. 61. On April 14, 2022, the Court granted the Claims Motion. (Doc. 77).

Now that the Claims Motion has been approved, the Receiver has distributed the approved Proof of Claim form to all potential claimants along with detailed instructions on preparing and submitting the completed form to the Receiver by the established submission deadline.[8]  Once that deadline passes and the Receiver has reviewed all timely-submitted claims, she will then file one or more motions seeking the Court's approval of (i) her determinations of timely submitted claims, and (ii) an interim (and additional as necessary) distribution to claimants with approved claims and the source(s) of funds used to make any distribution(s).

On April 15, 2022, the Receiver obtained a Court Order (Doc 77) approving Receiver's Motion to Establish and Approve (i) Proof of Claim Form and Claim Bar Date; (ii) Procedure to Administer, Review, and Determine Claims; and (iii) Notice Procedures and Incorporated

---

[8] A sample claims packet is attached hereto as Exhibit A and is also posted on the Receiver's website, www.propertyiireceivership.com

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

Memorandum of Law (the "Claims Motion"). After reviewing all claimant information and effectuating the sale of all real property in the Receivership Estate, the Receiver initiated the Claims Process, as outlined in the Claims Motion filed in this Court. Specifically, on June 30, 2022, Receiver sent 158 investors claims packets, explaining the claims process, providing Receiver's preliminary calculation of each investor's claim (for investors with documentation in the Receivership's possession), and requesting investors to complete a questionnaire (Claims Form) and provide documentation to establish their respective claims. A sample of the claims packet is available on the Receiver's website at www.piireceivership.com along with the instruction of who to contact in the event investors have questions regarding the process. The preparation of the claims estimates required having Receiver's professionals sort through extensive and often confusing or incomplete company documents to reconcile invested sums with any dividends or other payouts recorded as having been sent to investors. Receiver's professionals also had to engage in open source research to verify correct mailing addresses for about a half dozen investors whose addresses were not accepted by the UPS website for delivery labels, which required sending their packages for delivery by United States Post. As required in the Order, the Receiver also caused notices of the claims process to be published in two newspapers – the Sun Sentinel of Fort Lauderdale, Florida and the Wall Street Journal.

### vi.    Continued Outreach with Investors and Interested Parties

The Receiver and her counsel have been in contact with a number of investors and interested parties since her appointment.  The Court approved the Receiver's retention of a website vendor to establish an informational website that would provide relevant court documents, news, and other updates for investors and interested parties, and that website went live in July 2021 and is located at www.propertyiireceivership.com.  The website also allows interested parties to submit

15

their contact information to the Receiver, and the Receiver's team has been compiling that information and speaking with interested parties.

### B. Receiver's Preliminary Findings from Her Ongoing Investigation

The Receiver continues to locate, gather, and review company documents and other responsive records as part of her investigation. This has included the identification and review of company documents located in the storage unit, the imaging and review of documents stored in several computers previously used by the Receivership Entities, and obtaining documents from various third parties through subpoenas or other requests. This process has been complicated by the fact that Defendants do not appear to have maintained complete, current, and separate books and records for the various businesses operated by the Receivership Entities. Indeed, the Receiver's current investigation suggests that corporate formalities of those various businesses were routinely disregarded. The Receiver also understands that Defendants Brodman and Nicolosi have previously asserted their Fifth Amendment right against self-incrimination during the Commission's investigation and it has been communicated through their respective counsel that Mr. Brodman will continue to assert those rights during the Receiver's investigation. The Receiver and her team have worked tirelessly and proactively to push through these obstacles.

### i. The Equinox and Property Income Investors Offerings

#### a. The Equinox Offering

On or around November 14, 2012, Equinox was formed by Jeffrey Rosenfeld and David Cohen. On or around December 11, 2012, Equinox Holdings filed a Form D Notice of Exempt Offering of Securities with the Commission indicating it intended to raise up to $20 million in an offering that was purportedly exempt from registration pursuant to Rule 506. The Receiver has seen several connections between Equinox and a company named Medical Connections Holdings,

Inc. ("MCH"), including that (i) Jeffrey Rosenfeld previously served as the CEO of MCH, (ii) Defendant Nicolosi at one point served as the President of MCH, and (iii) several previous investors in MCH subsequently invested in Equinox.

As set forth in a Private Placement Memorandum dated January 17, 2013 (the "Equinox PPM"), Equinox told prospective investors it sought to capitalize from identifying and investing in "distressed and opportunistic real estate investments." The Equinox PPM indicated it was seeking to raise up to $7 million from investors, of which up to 10% of the proceeds would be used to compensate licensed broker/dealers for their efforts, and the vast majority of the proceeds would be used for "real estate acquisition development."  The PPM described two "targeted acquisitions" consisting of large parcels of undeveloped land that Equinox sought to purchase and subsequently develop with proceeds from the offering.

During that time period, Mr. Brodman was listed as Equinox's Chief Operating Officer and Director while Theodore Grothe was listed as the Vice President, Secretary, and Director.[9] Mr. Rosenfeld resigned from Equinox later in 2013,[10] and Mr. Brodman is listed as the company's CEO in its 2013 amended annual report.[11] As of the February 2016 annual report, Mr. Brodman was the only listed officer and director for Equinox.[12]

---

[9] http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2013%5C0906%5C00195349.Tif&documentNumber=P12000094600

[10] http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2013%5C1115%5C53565093.Tif&documentNumber=P12000094600

[11] http://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p12000094600-0a7d4e41-25ed-485b-a8ff-a26d32f50db3&transactionId=p12000094600-464d4b95-cc3d-49f7-82a3-b7b539b9ab37&formatType=PDF

[12] http://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p12000094600-0a7d4e41-25ed-485b-a8ff-a26d32f50db3&transactionId=p12000094600-494ca438-0bf0-4b90-96a2-5f9d7fba3024&formatType=PDF

17

The Receiver has obtained bank records for three bank accounts maintained by Equinox dating back to June 2013.   Based on the Receiver's preliminary investigation, it appears that Equinox raised approximately $3 million from at least 35 investors as early as November 18, 2012, and that Equinox continued to raise funds from investors as recently as August 2020.   A significant portion of these funds were raised prior to late 2016 when the Property Income Investors offerings began.   Although Equinox does appear to have used some investor funds to purchase real estate during 2012 – 2015, it appears that a significant portion of the $3 million was not used for the purchase of real estate.   Indeed, the Receiver has only been able to identify three real estate transactions in Broward and Palm Beach Counties involving Equinox during the time period from December 2012 to February 2015, none of which involved Equinox paying a purchase price higher than $108,000.   Moreover, although Equinox has not owned any real estate since February 2015, it appears that nearly $2 million was raised from Equinox investors from that time to the Receiver's appointment.   This investigation remains ongoing.

b.   <u>The Property Income Investors Offerings</u>

In March 2016, Brodman formed PII.   Brodman subsequently formed at least 10 entities between December 2016 and June 2019 that each contained "Property Income Investors" in the name followed by a specific number (which in most cases appears to have been a reference to the street number of a specific property).[13]   These entities were formed for the purpose of purchasing specific real estate parcels, and in most cases each entity opened a separate bank account at JP Morgan Chase.

---

[13] For example, PII 26 was formed in December 2016 and listed Mr. Brodman as the manager.   In or around December 28, 2016, PII 26 paid $495,000 to purchase a seven-unit multifamily residential property located at 26 Wisconsin St., Lake Worth, FL 33461.

18

No later than 2016, the Receiver understands that prospective investors were targeted to invest in PII (or related entities) through "cold calls" made by Brodman, Nicolosi, and apparently other sales agents working at Nicolosi's direction.  From speaking with investors, the Receiver has been told that the "cold calls" touted specific property(ies) that had been or would be purchased and promised annual returns ranging from 5% to 10% (with some investors being promised even higher returns).  Specifically, investors were told that they would receive returns derived from the Receivership Entities' renovation and ownership of multi-family properties consisting of (i) 70% of the net rental profits (with Brodman receiving the remaining 30%), and (ii) 50% of the profits when the property was sold (with Brodman receiving the remaining 50%).  Investors were assured that there was minimal risk and little to no downside associated with the investments.

The Receiver has identified private placement memoranda that were prepared by several of the Receivership Entities, including a September 2016 private placement memorandum prepared for PII (the "PII PPM").[14]  The PII PPM indicated to prospective investors, among other things, that:

- PII would "use the net proceeds from this offering to acquire property and for general working capital purposes";

- Cash commissions of up to 10% of the raised proceeds would be paid to any "licensed broker/dealers" assisting in the offering;

- Officers (i.e., Defendant Brodman) "will not receive a salary or management fee," but rather would be entitled to 30% of the Company's net income (or loss) from operations as well as 50% of the Company's gains (or losses) from the sale of any property.

- Investors holding Class B membership interests would be entitled to their pro rata share of 30% of the Company's net income (or loss) from operations as well as 50% of the Company's gains (or losses) from the sale of any property.

---

[14] As discussed below in Section V.B., it does not appear that the PII PPM was provided to a significant number of investors.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

- "Investors should not purchase our Class B membership interests if they need or expect to receive quarterly distributions."

- "We will use debt financing to acquire most of our properties. Lenders will place mortgages on these properties."

- "We expect to incur operating losses in future periods because we expect to incur expenses which will exceed revenues for an unknown period of time."

The "Use of Proceeds" section further specified that, assuming $4 million was raised during the offering, $3.6 million would be used to make real estate acquisitions and the remaining $400,000 would be used for working capital. The section further indicated that PII "reserve[s] the right to modify the use of proceeds as we deem fit at our sole discretion." The Commission has alleged that although the Receivership Entities raised at least $9 million from investors, at least $2.44 million was misappropriated by PII and Brodman. Doc. 1 ¶¶ 60-61. These allegations are consistent with the Receiver's preliminary review of the documents and financial statements in her possession.

      **ii.**    **At Least Some Receivership Entities Did Not Generate Sufficient Cash Flow to Cover Distributions to Investors and Depended on "Loans" From Other Receivership Entities to Meet any Shortfalls**

Prospective investors in the PII entities were told that they would receive quarterly distributions generated by the rental income received from the property owned by the entity they invested with. Although it appears that many investors simply received identical quarterly distributions that equated to an annual return ranging from 6% to 7%, the investment documents signed by each investor specified that any distributions paid to investors would be made from a percentage of the "Net Cash From Operations" with the remainder going to Mr. Brodman. However, it appears that at least several of the Receivership Entities did not generate sufficient cash flow from operations to pay the quarterly distributions made to investors, and those entities

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

instead depended on transfers (or "loans" which do not appear to have ever been repaid) from other Receivership Entities to pay the distributions.

For example, prospective investors interested in investing with PII 1361 were required to execute an Operating Agreement as a Class B Member.[15] In relevant part, Section 4.1(c) of that Operating Agreement provided that Class B Members would be entitled to receive periodic distributions in the amount of "70% of the Net Cash From Operations." The Operating Agreement defined Net Cash From Operations as:

> "Net Cash From Operations" means the gross cash proceeds from Company operations (including sales and dispositions of Company property in the ordinary course of business) less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Manager. Net Cash From Operations shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves as herein provided previously established pursuant to the first sentence hereof and from Net Cash From Sales or Refinancings.

Thus, the amount that should have been paid to a Class B Member would have been calculated by subtracting Company expenses, capital improvements, and other reserves from the income received during the company's operations which typically solely consisted of tenant rental income. During 2019, according to a Profit and Loss Statement generated by the Quickbooks software maintained by the Receivership Entities, PII 1361 generated $43,395.00 in rental income. However, PII 1361 also incurred $38,685.90 in expenses from operations, including $10,444.50 in property taxes, $3,534.31 in insurance expense, and $16,261.34 in repairs and maintenance. This resulted in PII 1361 generating net income of $4,709.10 during 2019. Pursuant to the Operating Agreement, investors (Class B Members) would have been entitled to 70% of this Net

---

[15] Mr. Brodman is believed to be the sole Class A Member of all PII entities.

Cash From Operations which should have resulted in <u>total</u> annual distributions to Class B Members of $3,296.37.

However, a review of PII 1361's bank statements show that a total of $42,484.00 in distribution checks were made during 2019 to investors.  Standing alone, this represented a nearly 100% distribution of all gross rental income received from tenants and was approximately 1,000% higher than the net cash from operations purportedly generated by PII 1361 during 2019. Additionally, the bank statements also suggest that PII 1361 may have significantly understated its repair and maintenance expenses based on $49,120.00 in apparently-unreported payments that appear to be for the renovation of one of the units – approximately $30,000 higher than the $16,261.34 in repairs and maintenance reported in PII 1361's 2019 Profit and Loss Statement.  In order to meet its ongoing expenses, including quarterly distributions paid to investors and other obligations including renovation expenses, PII 1361's bank account statements reflect **<u>over $100,000.00</u>** in incoming transfers from nine different PII entities.  In addition, the statements also reflect that $24,230.00 was transferred from PII 1361 to four different PII entities during that time period.

A similar pattern was seen in an analysis of financial and bank statements for PII 3504, which owned a property located at 3775 NW 116th Terrace, Coral Springs, FL 33065.  Although PII 3504 received $58,530 in rental income during 2019, the Profit and Loss Statement generated by the QuickBooks software maintained by the Receivership Entities reflected $34,358.98 in expenses which resulted in net income of $24,370.13.  However, during 2019, PII 3504 paid out nearly $28,000 in quarterly distributions to investors – more than the purported net income.  In addition, the P&L did not reflect (nor were investors informed) that PII 3504 had taken out a mortgage on the 3775 Property and that it made a total of $22,040.87 in monthly mortgage

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

payments during the majority of the year – in addition to the $34,358.98 in expenses reflected on the Profit and Loss Statement.[16]

The $58,530 in rental income received by PII 3504 during 2019 was not sufficient to pay the combined $84,382 in expenses, investor distributions, and mortgage payments.  In order to cover this shortfall, PII 3504's bank account statements reflect **over $50,000.00** in transfers from at least nine different PII entities.  In addition, the statements also reflect that $127,770 – which included the mortgage proceeds deposited in PII 3504's bank account in October 2019 – was transferred from PII 3504 to at least six different PII entities during that time period.

In sum, PII 1361 generated $43,395.00 in rental income during 2019, but during the same period it made total payments of over $100,000 for property expenses and investors distributions.  Similarly, the $58,530 in rental income received by PII 3504 was not sufficient to cover the total payments of the combined $84,382 in expenses, investor distributions, and mortgage payments.  Because the rental income generated by PII 1361 and PII 3504 during 2019 was not sufficient to cover the corresponding entity's expenses during that same time period, each entity thus necessarily depended on the deposit of funds from other entities (consisting of investments by other investors) to meet these shortfalls.  The Receiver is continuing her investigation to determine if similar shortfalls were present in other PII entities.

### iii.    Nearly $2 Million Was Paid To Company Insiders Including Brodman

A significant percentage of funds raised from investors were paid to company insiders – including Brodman.   According to payroll records from ADP, Brodman received at least

---

[16] The existing mortgage was satisfied in October 2019 when PII 3504 took out a new mortgage which resulted in the deposit of $106,443.62 in PII 3504's bank account.  Following deposit of the $106,443.62 mortgage proceeds, PII 3504 made a total of $107,200.00 in transfers to other PII entities – including the vast majority to the Property Income Investors Holdings account controlled by Brodman.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

$1,206,302 in Form 1099 compensation from 2014 to 2020 (excluding compensation paid during 2019, which was not included in the provided records).  The Receiver has also seen evidence that Brodman made significant withdrawals from various bank accounts belonging to the Receivership Entities in the past year.  The Companies' primary administrative employee, Cindy Lieberman, also received nearly $500,000 in salary during the same period – including a salary of $93,900 in 2019 and $107,000 in 2020.

From 2019 to 2021, it appears that nearly $500,000 was transferred from various company bank accounts to a bank account owned by LBB Maintenance & Repair, LLC ("LBB"), a company owned by Brodman.  Despite the name of the company suggesting it was in the business of maintenance and repair, it appears that LBB's primary purpose was to transfer funds from the PII Entities to Mr. Brodman or for his benefit.  A significant portion of funds transferred to LBB were then sent to Brodman's personal account where they were then used for Brodman's personal benefit including the payment of a mortgage, monthly lease payments for a Maserati, and other expenses.

These regular and recurring distributions to Brodman are contrary to representations in the PII PPM that "Mr. Brodman will not receive any compensation or management fee while overseeing the Company's operations," and several investors have also indicated that they were told this by Mr. Brodman or other sales agents.  A subsequent section of the PII PPM confirmed that "[o]ur officers will not receive a salary or management fees."  Rather, Mr. Brodman "would be allocated Class A Membership interests which would entitle him to 30% of the Company's net income (or loss) from operations and 50% of the Company's gains (losses) from the sale of any property."

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

The Commission has alleged that approximately $1.04 million was generated in **gross** rent payments during the Relevant Period (spanning over seven years), which would have entitled Brodman to at most approximately $312,000 as his share of rental payments during that span.  This of course does not account for any other expenses incurred during the Companies' operations, which would serve to correspondingly reduce the amount owed to Brodman (and investors).  As for the proceeds of property sales, the Commission has alleged (and the Receiver has not seen any contrary information) that no property sale proceeds were distributed to investors during the Relevant Period.  Instead, it appears that many investors were encouraged to "roll over" their profits from a property sale into another PII entity.  Accordingly, based on the representations to investors, Brodman would have been entitled **at most** to $312,000 (and likely less, after expenses) during the seven-year Relevant Period – an amount that is dwarfed by the $500,000 in transfers that was transferred to LBB alone from 2019 to 2021.

### iv.    The Use of Sales Agents to Solicit Investors and Payment of Transaction-Based Compensation

As referenced above, the Receiver has seen evidence that the Receivership Entities relied on sales agents to solicit prospective investors in the various Receivership Entities.  These sales agents include Defendant Brodman, an individual who appears to be Mr. Brodman's relative, Defendant Nicolosi, and several other individuals that were apparently affiliated with Nicolosi's company, CMP.  In a previous filing with the Commission, CMP was described as "a brokerage firm" and listed Nicolosi as its CEO.[17]  Of note, at least one of the sales agents affiliated with CMP appear to have used fictitious names when communicating with prospective investors.  It appears

---

[17] *See* https://www.sec.gov/Archives/edgar/data/1140303/000135448811001230/mcth_10ka.htm

25

that these sales agents primarily contacted prospective investors through the use of "cold calls" based on lead lists purchased from third parties.

The Receiver has not seen any evidence that any sales agents held the requisite licenses to sell securities.  The Receiver has learned that Defendant Nicolosi (when he was known as Anthony Peluso) was barred from the securities industry in June 2001 for engaging in high-pressure sales tactics and making misrepresentations to customers.  In June 2003, Mr. Peluso changed his name from Anthony Joseph Peluso to Anthony Joseph Nicolosi.  In 2010, Mr. Nicolosi was the subject of a cease and desist order from the Alabama Securities Commission based on his role in soliciting investors in a different company and his misrepresentations and omissions concerning his previous industry bar and name change.[18]

After making these "cold calls," those agents – either themselves or through an administrative employee at PII – sent correspondence (typically by email) to those prospective investors containing information on the proposed investment.  This correspondence usually consisted of a short description and potential returns of the specific property investment, an attachment containing pictures and projections for the property, and a "Subscription Booklet" containing instructions to complete an investment.  Of note, while the "Subscription Booklet" instructed interested investors to complete the attached Subscription Agreement and Operating Agreement, the vast majority of the Subscription Booklets distributed to prospective investors appear to only include the Subscription Agreement (and did not include the Operating Agreement).  Further, although the Subscription Agreement provides that the "offer and sale of securities is being made in connection with the private placement memorandum," it appears the "Subscription Booklet" often did not contain a copy of the PII PPM.  The Receiver has only seen that a very

---

[18] *See* https://asc.alabama.gov/Orders/2010/CD-2010-0062.PDF

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

limited amount of prospective investors received the PII PPM (and typically only when requested by a diligent prospective investor).

Some emails were sent directly by the sales agents, including the below email sent by Defendant Nicolosi:



In some instances, the agents advertised the ability for prospective investors to use their retirement funds for the investment.

The Receiver has seen information supporting the Commission's allegations that a significant amount of investor funds were used to pay commissions to these sales agents. For example, Nicolosi's company, CMP, received at least $888,170 in payments from the Receivership Entities during the Relevant Period. The Receiver has also seen additional payments to other sales

27

agents made through other bank accounts.  The Receiver believes that most, if not all, of these payments were provided as compensation for the solicitation of investors to the Receivership Entities.  Although Defendant Nicolosi has taken the position that at least a portion of his compensation was purportedly attributable to other non-solicitation activities, the Receiver understands that other individuals affiliated with CMP (including those who used fictitious names with prospective investors) had no duties other than soliciting investors.

### v.   Investor Funds Appear to Have Been Routinely Commingled and Used for Unauthorized Purposes for Several Years

A preliminary analysis conducted by the Receiver's forensic accountants indicates that approximately $9 million was raised from at least 150 investors during the relevant time period. The Receiver has seen significant evidence that investor funds were routinely commingled between the Receivership Entities' bank accounts for no apparent legitimate or business purpose; rather, it appears that corporate formalities were frequently disregarded and that a Receivership Entity facing a shortfall in currently-available funds would regularly use funds from other Receivership Entities as needed.  The Receiver has asked her forensic accountants whether it would be feasible to essentially "unwind" these various transactions and to attempt to treat each entity separately.  Although that inquiry remains ongoing, the Receiver has been informed that it would be significantly time-intensive (and costly) to attempt to reconcile material differences between the reported intercompany obligations owed among the companies, and that even after completing such a task it would still be uncertain whether the entities would be able to be treated as independent companies.

The Receiver has also seen a troubling pattern of investor funds being routinely misused or misappropriated as early as 2018 (and perhaps earlier).  For example, investor J.R. made an investment of $501,000 with Equinox Holdings in January 2018, of which $487,000 was deposited

28

into Equinox's bank account ending in x7387 (the "Equinox Account") on January 23, 2018 and the remaining $13,000 was deposited into the same account on January 30, 2018.  Prior to the initial deposit on January 23, 2018, the balance of the Equinox Account was less than $1,000. From January 23, 2018 to March 7, 2018, less than $500 in other deposits were made to the account.  During that period, the following activity took place in the Equinox Account:

- $101,200 in checks were written to Capital Market Partners, Defendant Nicolosi's company;

- $112,000 in checks were written to Defendant Brodman;

- $82,000 was transferred to a different Equinox Holdings bank account which was used to make payments of $77,162.50 to four investors;

- Various purchases that did not appear to be business expenses, including transactions at Best Buy, NYY Steakhouse, Dolphin Stadium, and Boston's on the Beach; and

- At least $10,500 in withdrawals.

Of the $112,000 in checks that were written to Brodman, one check for $76,000 dated March 1, 2018 was deposited into his personal account with the notation "Loan" in the memo:



The proceeds from this "loan" were apparently used (i) to make payments of approximately $70,000 to the U.S. Treasury/IRS, (ii) to make a $6,719.15 purchase at "Teacups Puppies and Boutiques," and (iii) a $3,000 payment on Brodman's home mortgage.  The Receiver has not seen

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

any indication this "loan" was repaid or any documentation one would expect in an arm's length transaction.

In another example, PII 26 purchased a property located at 417 N. E St., Lake Worth, FL in May 2018.  After that sale had closed, several additional investor deposits totaling $175,000 were deposited into PII 26's bank account (the "PII 26 Account") in June 2018.[19] The PII 26 Account had a beginning balance in June 2018 of $1,958.50.  During the following month, over $150,000 was transferred from the PII 26 Account to PII's bank account (the "PII Account").  Prior to these deposits, the PII Account had a beginning balance in June 2018 of less than $1,000. Following receipt of these transfers from the PII 26 Account, the PII Account made the following transfers:

- $102,436.82 to the Equinox Account;

- $12,272 to an account belonging to PII 9007;

- $14,000 to an account belonging to PII 201;

- $18,500 to an account belonging to PII 304; and

- $6,000 to an account belonging to PII 3504.

The $102,436.82 transferred to the Equinox Account (which had a beginning monthly balance of $2,637.18 prior to the transfers) was used to make the following transactions:

- A purchase of $795.00 at the "Palm Beach Equine Clinic" and a purchase of $1,036.23 at Dolphins Stadium.

- Nearly $50,000 in checks to Capital Market Partners, Defendant Nicolosi's company;

- Over $30,000 in checks to Mr. Brodman; and

- $1,036.23 to "Jetblue Vacations."

---

[19] Indeed, at least one wire transfer in the amount of $50,000 specifically includes the address for the 417 Property in the wire details.

30

In short, it appears that very little – if any – of the investor deposits in the PII 26 account during the June 2018 timeframe were used for any purpose relating to the 417 Property.

In early August 2020, at the same time that the Commission issued a subpoena to Defendant Brodman and the Receivership Entities, Brodman apparently reached out to investor J.R. – the same investor that had made the $501,000 investment referenced above – about an "opportunity that had come up" that required additional funds to close on a property.  Based on those representations, J.R. agreed to make an additional $400,000 investment (consisting of retirement funds) that were deposited into the Equinox Account on August 5, 2020.[20]  Prior to that $400,000 deposit, the Equinox Account had a balance of $2,756.65.  The same day that the $400,000 was deposited, the Equinox Account made the following transfers:

- $99,000 to an account belonging to PII;

- $22,000 to an account belonging to PII 26;

- $52,000 to an account belonging to PII 304;

- $16,000 to an account belonging to PII 9007;

- $13,000 to an account belonging to PII 4450; and

- $27,500 to an account belonging to Property Income Investors Holdings, LLC.

Of note, J.R. was not an investor in any of these PII entities.

Despite Brodman's representations to investor J.R. that the $400,000 investment would be used to purchase a property, the bank statements show that **none of the funds were used to purchase any real estate**.  Instead, at that time, the Receiver understands that quarterly distributions to investors for the first quarter of 2020 were several months overdue and that

---

[20] Based on the Receiver's review of records, it appears this deposit was made the day after a credit card for the Receivership Entities was used for a $3,000 charge to Mr. Brodman's attorney.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

distributions for the second quarter of 2020 were currently due.  Records reviewed by the Receiver indicate that at least $125,000 traceable to the $400,000 deposit were used to pay overdue quarterly distribution checks to investors.  **In other words, money from new investors was used to pay purported distributions to existing investors that was represented to be income from operations.**  Brodman also diverted (i) at least $46,000 traceable to the $400,000 deposit to the LBB Account which he controlled; (ii) $15,000 to make payments towards an overdue company credit card; and (iii) at least $30,000 to other Receivership Entities.  The Receiver is continuing to investigate these circumstances.

        vi.     **Over $50,000 of Investor Funds Were Lost When Brodman Forfeited a Real Estate Purchase Deposit**

The Receiver discovered that, in January 2021 and February 2021 (several months after the Commission issued a subpoena to Defendant Brodman and the Receivership Entities), the PII 26 Account wired a total of $55,000 to a law firm that Brodman had frequently used to handle real estate transactions on behalf of the Receivership Entities.  Further investigation showed that these transfers were a deposit for the purchase of a single-family residential property containing a horse barn and stalls located in Parkland, Florida.  It appears that Brodman intended for this property to be purchased by PII 26 using a loan that would be collateralized both by the property being purchased **and** the 3050 Property that had recently been purchased in August 2019 by PII 304.  The 3050 Property had been purchased free-and-clear (by a separate Receivership Entity with different investors), and this cross-collateralization would have significantly encumbered the property and thus diminished the value of any PII 304 investments.  In addition, the purchase of a single-family residential property (with a horse barn and stables) is inconsistent with the representations to investors that PII would use their funds to purchase residential multi-family properties for renovation, leasing, and resale.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

The day before the transaction was scheduled to close, Brodman informed his realtor that he would not be able to close the transaction. As a result, the $55,000 in investor funds that were being held as a deposit were forfeited to the seller and thus lost. There is no indication these losses were disclosed to investors.

## IV.   **THE NEXT QUARTER**

### A.   **Investigation**

Based on the Receiver's preliminary investigation, it appears that the Properties (together with the $1.15 million in sale proceeds that were being held in trust at the time of the Receiver's appointment) represent the largest (and likely only) assets of material value that are attributable to investor funds. With the assistance of her retained professionals, the Receiver will continue to interview third parties and gather and review relevant documents from the Receivership Entities and third parties. It will be necessary to obtain and review all such documents in order to complete an understanding of the operation of the various Receivership Entities, the flow of funds through and for the benefit of those Receivership Entities, to identify any additional sources of recovery, and to prepare an accounting. The Receiver continues to work diligently on this task, but without knowing the volume of documents she expects to receive, it is difficult to estimate the time needed for completion.

The Receiver's investigation will also focus on identifying relevant documentation to allow her forensic accountants to complete an analysis of all investor transactions, a necessary task to assess and administer a Court-approved claims process. In the course of reviewing, analyzing, and compiling this information, the Receiver may also request that certain investors provide copies of relevant documentation evidencing their relationship with the Receivership Entities.

The Receiver will continue to attempt to locate additional funds and other assets and may institute proceedings to recover assets on behalf of the Receivership Entities.  In an effort to more fully understand the conduct at issue and in an attempt to locate more assets, the Receiver will continue to conduct interviews and/or depositions of parties and third parties who may have knowledge of the fraudulent scheme.

**B.**     **Administering Claims Process, Determining Submitted Claims via Proof of Claim Forms with attached Documents, and Seeking Court Approval of Claim Determinations and Distribution Plan**

On December 31, 2021, the Receiver filed her Claims Motion with the Court, which, in relevant part, sought approval of the framework and procedures for a claims process through which recovered funds could eventually be distributed to claimants with approved claims.   On April 15, 2022, the Court approved the Claims Motion and the Receiver moved forward with mailing the approved Proof of Claim form to known potential claimants along with detailed instructions on preparing and submitting the completed form to the Receiver by the established submission deadline.  The Claims Bar Deadline is September 28, 2022. Once that deadline passes and the Receiver has reviewed all timely-submitted claims, she will then file a one or more motions seeking the Court's approval of (i) her determinations of timely submitted claims, and (ii) an interim (and additional as necessary) distribution to claimants with approved claims and the source(s) of funds used to make any distribution(s). The Receiver and her staff will effectuate communications with all claimants regarding the Claims Process as Proof of Claims Forms are sent in. The Receiver has updated her informational website at www.propertyiireceivership.com to provide the latest guidance for prospective claimants and the Claims Process.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: Two South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131-1822 :: T 305 347 4080 :: F 305 347 4089

C.   **<u>Third Party Claims</u>**

The Receiver continues to analyze the existence and viability of potential claims against third parties that may have received payments or transfers to which they were not entitled to receive or persons or entities that provided services to or otherwise improperly benefitted from their affiliation with the Receivership Entities.  It is too early to estimate whether or not the Receiver will bring any such claims or whether any claims will result in any recovery to the Receivership Estate.  In proceeding with these determinations, the Receiver intends to consider a number of factors, including the cost-benefit analysis of bringing any potential claim.  Thus, the Receiver is not yet able to predict the likelihood, amount, or effectiveness of any particular claim or the claims as a whole.  The Receiver may, however, plan to first offer those who are required to return money to the Receivership Estate the opportunity to do so cooperatively in an effort to avoid costly litigation for all involved.  The Receiver intends to seek Court approval before instituting any such third-party actions.

Date: August 1, 2022                    Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**
One Biscayne Tower
2 S. Biscayne Blvd, Suite 1500
Miami, FL 33131-1822
T: 305-347-4080
F: 305-347-4089
raquel.rodriguez@bipc.com

By: */s/ Raquel A. Rodriguez*
    Raquel A. Rodriguez, Esq.
    Florida Bar No. 511439

and

35

**BUCHANAN INGERSOLL & ROONEY PC**
Truist Financial Place
401 E. Jackson St., Suite 2400
Tampa, FL  33602
T: 813-222-1141
F: 813-222-8189

By: */s/ Lauren V. Humphries*
    Lauren V. Humphries, Esq.
    Florida Bar No. 117517
    lauren.humphries@bipc.com
*Attorneys for Receiver, Miranda L. Soto*

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to the

following counsel of record:

| | |
|---|---|
| Alice Sum, Esq. | Mark C. Perry, Esq. |
| Securities and Exchange Commission | 2400 East Commercial Blvd., Ste 201 |
| 801 Brickell Avenue, Suite 1950 | Fort Lauderdale, Florida 33308 |
| Miami, Florida 33131 | *Counsel for Defendant, Anthony* |
| *Counsel for Plaintiff, Securities and* | *Nicolosi, f/k/a Anthony Peluso* |
| *Exchange Commission* | |

I further certify that on August 1, 2022, a true and correct copy of the foregoing was sent via electronic
mail to the following:

Carl F. Schoeppl, Esq.
Schoeppl Law, P.A.
4651 North Federal Highway
Boca Raton, Florida 33431-5133
Telephone: (561) 394-8301
Facsimile: (561) 394-3121
E-mail: carl@schoeppllaw.com
*Counsel for Defendant Larry Brodman*

Larry Brodman
E-mail: larrybro58@gmail.com

        */s/ Raquel A. Rodriguez*
        **BUCHANAN INGERSOLL & ROONEY PC**

36